

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

August 14, 2025

**BY ECF**

Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *United States v. Wolfe Margolies*, 19 Cr. 178, 22 Civ. 3489 (KMW)

Dear Judge Wood:

The Government writes in response to the defendant's supplemental memorandum (the "Supplemental Memorandum") in support of his motion (the "Motion") to vacate his sentence pursuant to 28 U.S.C. § 2255. The Government refers the Court to its opposition (the "Opposition") to the Motion for a discussion of, among other things, the procedural history of this matter, the governing law, and the affidavit of Maurice Sercarz, the defendant's counsel in the underlying matter, and the core arguments for why the Motion is meritless. (Dkt. 71). The Government writes briefly here to address specific points made in the Supplemental Memorandum that are either contrary to the law or factual record.

### I.   *Anderson* and *Gaylord* are Inapposite

In support of his argument that Mr. Sercarz failed to sufficiently investigate cause of death of the Victim,[1] the defendant cites *Anderson v. United States*, 981 F.3d 565, 576 (7th Cir. 2020). (Dkt. 80 at 13). But the nature of the plea agreement here is entirely unlike in *Anderson*, where the defendant had been charged with and entered a guilty plea to the statutory death-resulting count, which carried a 20-year mandatory minimum sentence. 981 F.3d at 569-70. Here, by contrast, the defendant reaped a substantial benefit in agreeing to plead to a lesser offense which did not carry a mandatory minimum, and it was reasonable for his attorney to advise him to take the plea rather than conducting extensive further investigation, given that the delay associated with such investigation would likely also have led the Government to investigate further and increased the likelihood that the defendant could be charged with the more serious crime or have withdrawn the favorable plea. Mr. Sercarz made clear that this was a key consideration, and, in reaching an

---

[1] Capitalized terms herein have the same definition as in the Opposition.

early plea agreement to a lesser offense, he achieved a substantial benefit for his client. (Sercarz Affidavit ¶¶ 39-40, 51-53)); *see Premo v. Moore*, 562 U.S. 115, 125 (2011) (a defense attorney "often has insights borne of past dealings with the same prosecutor or court" that inform the plea bargaining decision). For the same reason, the defendant's citation to *Gaylord v. United States*, 829 F.3d 500, 504 (7th Cir. 2016), in which the defendant pleaded to the statutory death-resulting offense with the 20-year mandatory minimum sentence, is entirely inapposite. (Dkt. 80 at 13).

In addition, the facts of this case are entirely unlike those in *Anderson* and *Gaylord*. Contrary to the defendant's claims, this case is far stronger than *Anderson* and *Gaylord*. In *Anderson*, there was evidence that the victim "ingested two heroin doses the day he died; only one came from [the defendant]," the victim also had Benadryl in his system, and the postmortem report simply listed the cause of death as "opiate intoxication." 981 F.3d at 573. Similarly, in *Gaylord*, the defendant sold the victim only oxycodone, but the victim's "cause of death was 'oxycodone and cocaine intoxication." 829 F.3d at 507. In contrast, here, the evidence indicated that the defendant was the Victim's only source of heroin. (Opposition at 2, 19). And the link between the drugs distributed by the defendant and the Victim's death was much more direct, because the Victim stopped using his cellphone shortly after receiving the heroin from the defendant. (*Id.* at 19). Finally, unlike in *Anderson* and *Gaylord*, the medical examiner's report here was unambiguous that a single source, "Acute Heroin Intoxication," was the cause of death. (*Id.* at 2).

Faced with this powerful evidence, it was entirely reasonable for Mr. Sercarz to advise the defendant to take a favorable plea agreement rather than running the risk of a lengthy mandatory minimum sentence. In his affidavit, Mr. Sercarz explained his thinking at the time: "the jury could find (1) that the bundles of heroin described in the text messages in which the deceased placed his order with Ekin Erkan, who in turned contacted the defendant, were the source of the 19 glassines found in close proximity to the deceased; (2) that shortly after receiving the delivery, the decedent injected one packets of heroin included in the delivery; and (3) that the 'acute heroin intoxication' described in the Coroner's Report resulted from the heroin delivered by the defendant." (Sercarz Affidavit ¶ 34).

In light of all of the possibility of additional charges, discovery of additional evidence, and withdraw of the plea offer, Mr. Sercarz's investigatory steps were entirely reasonable. *Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.").

II. **Mr. Sercarz Took Reasonable Steps to Investigate the Applicability of the Section 2252A(d) Affirmative Defense**

The defendant claims that Mr. Sercarz failed to investigate the applicability of the affirmative defense under Section 2252A(d). To begin, as discussed at length in the Opposition, it is highly unlikely the Section 2252A(d) defense would apply—because there is (1) no evidence that the defendant "promptly" destroyed the Toddler Rape Video or that he deleted it "in good faith," and (2) it is far from clear that the defendant would have been able to show that he only possessed three or fewer images of child pornography. (Opposition at 21-24). In light of this, any failure by Mr. Sercarz to investigate further would have been "objectively reasonable." *United*

*States v. Patasnik*, 89 F.3d 63, 68 (2d Cir. 1996); *see also United States v. Nersesian*, 824 F.2d 1294, 1321-22 (2d Cir. 1987) ("Where the evidence against a defendant is overwhelming, even numerous missteps by trial counsel—including 'waiver of an opening statement, brief summation, failure to raise objections, . . . failure to file certain motions, and failure to adequately investigate, prepare, and vigorously pursue a defense'—do not amount to ineffective assistance.").

But this is academic: the record belies the defendant's assertion that the Mr. Sercarz failed to investigate.

First, Mr. Sercarz interviewed the defendant, who admitted to being interested in and possessing child pornography:

> [T]he defendant admitted to an interest in images of adolescents and children, including those that qualified as child pornography. He described his communication with others regarding these interests in a variety of chatrooms. And, he admitted to having received images on a variety of websites. Among the images that he recalled receiving was the video of an adolescent forcibly engaging in intercourse with an adult.

(Sercarz Affidavit ¶ 12).

Second, Mr. Sercarz made clear that he was "thorough in seeking any material in the possession of the Government demonstrating that the images extracted from the defendant's phone or other sources qualified as child pornography; were received from others; or, that the defendant promptly deleted the items." (*Id.* ¶ 15).

Third, Mr. Sercarz was aware law enforcement officers had seized "over 35,000 images of child erotica," including the Toddler Rape Video, "[a]nd, given the volume of erotic material found on his devices, there was every likelihood that additional child pornography would be found as the search continued." (*Id.* ¶ 18). In addition, Mr. Sercarz was aware that "a diary found in the defendant's luggage at the time of his arrest contained entries by the defendant regarding his fascination with what he described as child pornography." (*Id.* ¶ 18).

Fourth, Mr. Sercarz retained an expert, who found that the defendant's interest in "child erotica" was a "method to coming to grips with his own experience of child rape and sexual abuse." (*Id.* ¶ 21).

The record makes clear then that Mr. Sercarz engaged in a reasonable investigation. He interviewed his client, engaged an expert, and reviewed the evidence at hand—which all demonstrated the defendant's interest in and possession of child pornography. Knowing that the defendant possessed over 30,000 images of child erotica, Mr. Sercarz reached the entirely reasonable conclusion that it was highly likely that additional images of child pornography would be found within those images. The law requires defense counsel to investigate, but it does not require the defense to waste its time. As discussed below,

additional delay in negotiating a plea offer would have, in all likelihood, resulted in the defendant facing far more prison time.

### III. Mr. Sercarz Did Not Blindly Accept the Government's Representations

The defendant claims that Mr. Sercarz "simply accept[ed] prosecutorial representations about evidence strength." Not so. Mr. Sercarz requested and reviewed discovery produced by the Government, hired an expert, interviewed the defendant on numerous occasions, made specific, targeted, *Brady* demands on the Government, and even hired an expert to evaluate the defendant. (Affidavit ¶¶ 11-22).

The defendant argues that Mr. Sercarz somehow acted deficiently by accepting the Government's proffer that it had no *Brady* materials in its possession. To begin, there was no requirement that Mr. Sercarz make a demand in the first place, as there was no reason to think "that there had been any withholding of Brady material such that a demand for the material would have been appropriate." *Romero v. United States*, No. 15-CV-6512 (LAP), 2017 WL 4516819, at *8 (S.D.N.Y. Sept. 21, 2017). Mr. Sercarz nevertheless went beyond what was required by the law and made specific demands. And there was no basis for Mr. Sercarz to subsequently doubt the Government's representations that it did not possess any *Brady* material. *See Monserrate v. United States*, No. 10 Crim. 965 (CM), et al., 2014 WL 7179628, at *7 (S.D.N.Y. Dec. 10, 2014) ("There is no indication in this case that the Government violated its discovery obligation and there was nothing infirm about counsel's pursuit of discovery or review of the same with his client."). Indeed, the Government, with its resources and months of investigation, was far better positioned than Mr. Sercarz to identify *Brady* material. And yet, through the course of the Government's investigation, it found none.

### IV. The Defendant Fails to Establish Prejudice

The defendant makes a number of arguments for why, if the Court were to find Mr. Sercarz's assistance deficient, there was prejudice. None of these arguments have merit.

#### A. There was Ample Causation Evidence for the Death Resulting Enhancement

The defendant argues that further investigation would establish that the weakness in the causation evidence for the Death Resulting Enhancement, diminishing the defendant's incentive to plead. (Dkt. 80 at 16). But, as set forth above and in the Opposition, the causation evidence was strong, and Mr. Sercarz did engage in a reasonable investigation. (Opposition at 18-20). Each of the points the defendant makes to suggest weakness in the causation evidence is either wrong or unavailing:

*First*, the defendant claims that "[s]tandard pharmacokinetic analysis would have shown that heroin's effects typically last 3-5 hours, making death eighteen hours later highly unusual absent intervening factors." (Dkt. 80 at 16-17). But the Victim's body was *found* 18-hours after meeting with the defendant; in all likelihood, the Victim actually died

much earlier than that. Indeed, the Victim's lack of any outbound cellular communications after meeting with the defendant strongly suggest that he in fact died shortly after the meeting. (Opposition at 19). In addition, the medical examiner's report concluded that the cause of death was acute heroin intoxication, meaning that the Victim died of the very drugs that Margolies provided him with. (*Id.*). The medical examiner did not list any "[o]ther significant conditions contributing to death." (*Id.*).

*Second*, the defendant references a stray comment at his bail hearing, where the Government stated that "various heroin and I believe fentanyl" had been found in the Victim. (Dkt. 80 at 13). Given that the only drug identified in the medical examiner's report was heroin, it appears that the Government simply misspoke in the course of un-prepared remarks at an early stage of the case.

*Third*, the defendant attacks the fact that there was no toxicology report. But there is no requirement for a toxicology report. *See Foster v. Warden Fort Dix FCI*, No. 22-1011, 2022 WL 3098677, at *2 (3d Cir. Aug. 4, 2022) (affirming district court's denial of 2255 motion in the absence of a toxicology report where the medical examiner testified that "she had no doubt that the heroin killed the victim"). And, as discussed in the Opposition, courts have routinely affirmed convictions based on evidence that is similar to, or even less powerful than, the evidence here that Margolies' offense caused the Victim's death. (Opposition at 18-19).

*Fourth*, the defendant claims that the Government offered no evidence concerning the NYPD's search of the Victim's apartment, including the circumstances surrounding the discovery of the Victim's body. (Dkt. 80 at 18). That is not true. As part of discovery, the Government produced NYPD reports that make clear that the Victim was "found by a roommate [] in the living room laying down, lying face up on the couch." In addition, the NYPD reports included, among other things, photos of the heroin recovered from the scene, photographs of the Victim, and notes from the interview of the roommate.

*Fifth*, the defendant notes the Government did not offer witness testimony or notes concerning the circumstances behind the Victim's death. To begin, as noted above, that is not true. But, more fundamentally, because the defendant bargained for a favorable early plea agreement, the Government's production of witness notes was appropriately limited. This was not a factor "cry[ing] out for further investigation" that the defendant attempts to claim. (Dkt. 80 at 17-18). The vast majority of criminal defendants plead guilty before they receive Jencks Act material—as avoiding the need to produce statements revealing its witnesses is a material basis for the Government's plea offers—and, as a predictable result, the record regarding their guilt is less developed than the record that follows a trial or even a later-in-time plea. Mr. Sercarz, a seasoned practitioner with decades of experience, assuredly knew that in counseling the defendant to plead guilty. *See Premo*, 562 U.S. at 124 (cautioning that guilty pleas should not be "too easily set aside based on facts and circumstances not apparent to a competent attorney when actions and advice leading to the plea took place"). All of the defendant's remaining factual arguments rest on this fundamental misapprehension about the posture of his case when he made the decision to plead guilty.

### B. The Defendant Received Substantial Benefits by Entering into the Plea Agreement

The defendant argues that the prospect of an acquittal meant that the Plea Agreement was a bad deal. But, as discussed above and in the Opposition, the likelihood of an acquittal was actually very low. Mr. Sercarz explained his thinking in recommending that the defendant accept the Plea Agreement:

> In my conversations with the defendant, I brought to his attention, the benefits of the Plea Agreement proposed by the Government in addition to the fact that it would spare him from confronting a superseding Indictment that included the "death resulted" count that carried a mandatory minimum sentence of 20 years. These additional benefits included the following: First, the Agreement would cover all conduct attributed to the defendant both with regard to his involvement in the Ekin Erkan narcotics distribution conspiracy and, the receipt and possession of child pornography. Second, the defendant's acceptance of the Plea Agreement would put an end to the continuing search by agents of law enforcement for additional child pornography stored on the defendant's phone and in other locations. Third, because the Offense Level for the Narcotics Conspiracy count was substantially greater than the Offense Level for the Child Pornography count, the Plea Agreement disregarded the child pornography count for the purpose of calculating the defendant's combined Offense Level. And, fourth, the defendant would derive the benefits of having entered a guilty plea at an early stage; and having received a 3-point downward adjustment for Acceptance of Responsibility.

(Affidavit ¶ 39). In other words, both Mr. Sercarz and the defendant made a reasoned decision to accept the Plea Agreement that allowed the defendant to avoid a 20-year mandatory minimum, limiting "[l]imite[ed] his criminal exposure" in a way that "was of considerable value to him." *United States v. Morgan*, 406 F.3d 135, 137 (2d Cir. 2005). Mr. Sercarz was free then to argue for a substantially below Guidelines sentence, which he did. As the Second Circuit has recognized, a defendant is not prejudiced by entering into a plea agreement that allows him to avoid trial and meaningful sentencing enhancements. *See, e.g., United States v. Reap*, 391 F. App'x 99, 102 (2d Cir. 2010) (noting that the defendant benefited from his plea deal because he, inter alia, "avoided having to defend against the government's case . . . [and] eliminated any element of risk in proceeding to trial").

* * *

For the reasons set forth above, and the reasons stated in the Opposition, the Motion should be denied.

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

by: _____
Adam Sowlati
Assistant United States Attorneys
(212) 637-2438

Cc:    Defense Counsel (by ECF)