**MASSENA LAW P.C.**
305 Broadway, Suite 1001
New York, New York 10007
(P) 212-766-1700 ♦ (F) 212-766-1701
Email: AVM@Massenalaw.com

• Admitted in Federal and
  New York State Courts

September 29, 2025

<u>**VIA ECF All Parties**</u>
Honorable Kimba M. Wood
United States District Judge
United States Court House
500 Pearl Street
New York, New York 10007

Re: *USA v. Wolfe Margolies*, 19-Cr-178,

Dear Judge Wood:

     Mr. Margolies respectfully submits this reply to address the Government's response dated August 14, 2025. (Dkt. 84). The Government's arguments fail to overcome the fundamental constitutional violations established by the record and confirmed by the Second Circuit's remand finding "a plausible claim for relief."

**PRELIMINARY STATEMENT**

     The Government's response demonstrates precisely why this case demands relief. The Government's arguments fundamentally mischaracterize both the legal standards and the factual record, inadvertently confirming the very constitutional violations Mr. Margolies alleges. While claiming counsel conducted an adequate investigation, the Government cannot identify a single expert consulted, a toxicologist retained, or a pharmacokinetic analysis performed—despite causation being the central issue determining Mr. Margolies's sentence. The Second Circuit has already determined these claims have merit. The developed record now compels granting relief.

**ARGUMENT**

**POINT I: DEFENSE COUNSEL'S COMPLETE FAILURE TO INVESTIGATE CAUSATION EVIDENCE FELL FAR BELOW CONSTITUTIONAL STANDARDS**

**A. The Death Resulting Enhancement**

    1. **The Government's Own Evidence Demonstrates Why Expert Investigation Was Constitutionally Required**

The Government's argument inadvertently confirms the constitutional violations in this case. Far from supporting their position, the Government's admissions about the evidence it provided - including "photos of the heroin recovered from the scene, photographs of the Victim, and notes from the interview of the roommate" - actually demonstrate why expert investigation was constitutionally required and reveal the scope of counsel's investigative failures[1]. (Dkt. 84 at 5).

**a. The Missing Glassines Demand Explanation and Create Multiple Alternative Causation Theories**

The Government's own evidence revealed a fundamental discrepancy that demanded immediate investigation. Mr. Margolies allegedly sold Victim-2 "three bundles" (30 glassines), but only 21 glassines were found at the scene. (19 Cr. 178, Dkt. 178 at 18). This nine-glassine discrepancy demands explanation, particularly given that the controlled buy reports show Mr. Margolies consistently delivered the correct quantities. The March 21, 2018, transaction involved exactly 100 glassines as ordered, and the May 1 transaction involved exactly 30 bundles as ordered. This pattern of accuracy makes the missing glassines critical to understanding causation.

The missing glassines create three distinct alternative theories, each requiring expert analysis. Under the consumption theory, the victim had consumed nine glassines from Mr. Margolies's supply, making the timing of death critical to determining causation. Under the multiple source theory, the victim obtained additional drugs from other sources, explaining both the missing glassines and the prosecutor's admission of "various heroin and I believe fentanyl" in the victim's system. (Dkt. 80 at 13). Under the alternative supplier theory, the 21 glassines found came from a different supplier entirely, particularly given Erkan's "fent free" representation versus the prosecutor's fentanyl admission. Any reasonable attorney confronted with this discrepancy would have demanded expert analysis to determine which scenario explained the missing glassines and whether Mr. Margolies's heroin was the "but for" cause of death.

**b. The Controlled Buy Evidence Demonstrates Critical Product Variations Requiring Expert Analysis**

The controlled buy evidence demonstrates why these alternative theories were viable and why an investigation was constitutionally required. The Government's admission that it provided "photos of the heroin recovered from the scene" actually proves Mr. Margolies's point about inadequate investigation. (Dkt. 84 at 5). These photos would have shown critical evidence requiring expert analysis that was never conducted. The controlled buy reports from the NYPD reveal dramatic variations in product testing, making such analysis essential.

The drug composition varied significantly across transactions. On March 2, 2018, UC-1 purchased five bundles (50 glassines) that tested positive for heroin only. Just one week later, on March 9, 2018, UC-1 purchased five bundles that tested positive for "heroin and fentanyl." The March 21, April 3, May 1, and May 11 transactions all tested positive for heroin only. This pattern shows Mr. Margolies sometimes sold "fent free" heroin and sometimes sold fentanyl-contaminated heroin, creating obvious questions about which type was involved in the victim's death.

The packaging and markings varied just as dramatically across transactions, requiring expert comparative analysis. The March 2 and March 9 transactions involved white glassines with no markings or stamps. The March 21 transaction involved mixed packaging within a single sale, 40 glassines stamped "POWERDRIP IN BLUE INK" and 60 glassines stamped "2K18 IN RED INK." The April 3 transaction used white foil packaging stamped "GOT MILK?" while the May transactions involved various white glassines with different or no markings. Expert

---

[1] Counsel reviewed the discovery provided by trial counsel that contained seven detailed undercover buy reports. Upon request of the Court, Counsel shall provide the buy reports to the Court under separate cover

analysis comparing the stamps and markings on glassines found at the death scene with these documented variations would have been essential to determining source identification and causation.

### c. The "Fent Free" Representation Creates a Fatal Contradiction in the Government's Theory

The controlled buy evidence creates a devastating contradiction in the Government's causation theory. Erkan specifically told Victim-2 that Mr. Margolies's product was "fent free" and of "very high quality" at $80 per bundle. Yet the prosecutor acknowledged at the bail hearing that "various heroin and I believe fentanyl" was found in the victim's system. (Dkt. 80 at 13). The UC buy reports prove this contradiction is legally significant. Five of six controlled buys tested positive for heroin only, while only the March 9 transaction tested positive for "heroin and fentanyl." This pattern corroborates Erkan's representation that Mr. Margolies typically sold "fent free" heroin.

If fentanyl was found in the victim's system despite ordering "fent free" heroin, this creates compelling evidence of alternative causation. The victim either obtained fentanyl-contaminated heroin from another source during the eighteen-hour window, or the fatal dose came from a different supplier entirely. Expert analysis was essential to determine whether the death scene heroin matched the "fent free" or fentanyl-contaminated controlled buy samples, conduct chemical fingerprinting to identify the source of any fentanyl in the victim's system, perform comparative analysis of packaging and stamps to determine supplier identification, and provide pharmacokinetic analysis of mixed heroin/fentanyl toxicity versus heroin-only toxicity. This contradiction—a "fent free" order versus fentanyl in the victim—created obvious reasonable doubt about "but for" causation that counsel was constitutionally required to investigate.

### d. The Eighteen-Hour Temporal Gap Required Pharmacokinetic Expert Analysis

The Government's speculation that the victim "in all likelihood" died "much earlier" than eighteen hours after meeting Mr. Margolies cannot overcome the constitutional requirement for investigation. (Dkt. 84 at 4-5). The Government's argument actually confirms the problem: without expert pharmacokinetic analysis, neither counsel nor the Court can determine when death likely occurred or whether heroin consumed eighteen hours earlier could be the "but for" cause. Standard pharmacokinetic analysis would have shown that heroin's effects typically last three to five hours, making death eighteen hours later highly unusual, absent intervening factors. The eighteen-hour gap required expert testimony about heroin's duration of effect and elimination half-life, the likelihood of fatal overdose eighteen hours after consumption, the impact of mixing different heroin sources or heroin with fentanyl, and pharmacokinetic analysis of the victim's drug consumption timeline.

The Government's reliance on the medical examiner's conclusion of "acute heroin intoxication" misses the point entirely. (Dkt. 84 at 5). That conclusion addressed what killed the victim, not which heroin killed him—the critical "but for" causation question under Burrage. The medical examiner's finding that only heroin caused death does not establish that Mr. Margolies's specific heroin was the "but for" cause, particularly given the eighteen-hour gap and mixed-drug evidence.

### e. The Crime Scene Photo Discrepancy Raises Additional Constitutional Concerns

The Government's assertion that it provided "photos of the heroin recovered from the scene" raises serious concerns that were not addressed in the proceedings below. (Dkt. 84 at 5). Counsel has conducted a review of all discovery materials provided to trial counsel during the underlying proceedings, and significantly, no crime scene photos are included in the discovery production. This creates a troubling inconsistency that actually strengthens Mr. Margolies's constitutional claims.

If crime scene photos exist as the Government now represents, they should have been provided to defense counsel as part of standard discovery, particularly given Mr. Sercarz's specific demand for "crime scene photos." (Sercarz Affidavit ¶ 13). The failure to provide such critical evidence would constitute a discovery violation that further prejudiced the defense. Alternatively, if these photos were provided but Mr. Sercarz failed to analyze them for heroin packaging, stamps, markings, and comparative analysis with the controlled buy evidence, this would constitute additional proof of constitutionally deficient investigation. Most importantly, if such photos existed and depicted the specific packaging and markings of the 21 glassines found at the scene, expert analysis comparing these images to the detailed controlled buy evidence would have been essential to determining causation. The Government cannot now claim that adequate discovery was provided while simultaneously referencing evidence that was either never produced or never analyzed, both of which demonstrate the constitutional violations that infected Mr. Margolies's representation.

**f. Later-Produced Evidence Cannot Cure Pre-Plea Investigative Failures**

The Government's argument that it later produced NYPD reports and witness statements fundamentally misunderstands the constitutional standard. (Dkt. 84 at 5). The Sixth Amendment requires competent investigation before advising a client to plead guilty, not after. Mr. Sercarz's constitutional duty was to investigate the causation evidence before recommending acceptance of a plea agreement that increased his client's sentence by 26 offense levels. The Government's reliance on later-produced evidence actually confirms the constitutional violation. If this evidence had been available during the investigation but not analyzed before the plea, it would demonstrate counsel's failure to demand and examine critical evidence. If this evidence were not available, it would show that the Government was seeking a massive sentencing enhancement based on an incomplete investigation—precisely the scenario that necessitated an independent defense investigation.

**2. This Case Presents Stronger Grounds for Relief Than Anderson and Gaylord**

The Government's attempt to distinguish Anderson and Gaylord fails fundamentally. (Dkt. 84 at 1-2). Far from being "inapposite," these decisions establish the precise framework that compels relief here—and this case presents even stronger grounds than either precedent.

**a. The Temporal Gap Here Creates a Compelling Need for Investigation**

The Government argues this case is "stronger" than Anderson because the victim here allegedly died closer to the drug delivery. This argument ignores the critical temporal evidence and actually proves Mr. Margolies's point. In Anderson, the court found that an investigation was required where the record indicated that doses could have been injected and death occurred within "only a few hours," though exact times were unknown. United States v. Anderson, 981 F.3d 565, 573 (7th Cir. 2020). Here, eighteen hours elapsed between the alleged transaction and discovery of the victim's body, creating an even more compelling need for expert pharmacokinetic analysis to determine whether Mr. Margolies's heroin could be the "but for" cause of death. The Government's own prosecutor acknowledged that heroin's effects "typically last 3-5 hours," making death eighteen hours later highly unusual absent intervening factors. (Dkt. 80 at 16-17). The temporal gap here demands heightened scrutiny, not diminished concern.

**b. The Mixed-Drug Evidence Here Is More Compelling Than in Precedent Cases**

The Government claims the causation evidence here was "much more direct" than in the precedent cases, but this assertion contradicts the record. (Dkt. 84 at 2). The prosecutor's admission of "various heroin and I believe fentanyl" in the victim's system (Dkt. 80 at 13), Erkan's specific representation that Mr. Margolies's product was "fentanyl free," and the eighteen-hour window for consuming substances from other sources created compelling

mixed-drug indicators requiring investigation. In Gaylord v. United States, 829 F.3d 500, 503 (7th Cir. 2016), the victim died after ingesting oxycodone distributed by Gaylord as well as cocaine from another source, and the Seventh Circuit found that counsel's failure to investigate causation was constitutionally deficient. The controlled buy evidence in this case documenting variations in drug composition and packaging across multiple transactions provided concrete evidence of product variability that could have been analyzed to determine whether Mr. Margolies's heroin matched the fatal dose.

### c. Counsel's Investigative Failures Here Exceed Even Those Found Constitutionally Deficient in Published Decisions

Most critically, counsel's investigative failures here exceed even those found constitutionally deficient in published decisions. Unlike counsel in Anderson and Gaylord, Mr. Sercarz retained no medical experts, conducted no pharmacokinetic analysis, and made no independent investigation of causation, despite obvious vulnerabilities. (Sercarz Affidavit ¶¶ 11-22). The Sercarz affidavit confirms these deficiencies, contradicting the Government's characterization of "adequate" investigation. Where counsel in the precedent cases at least attempted some form of expert consultation, Mr. Sercarz's wholesale abandonment of investigation falls further below constitutional standards.

### 3. The Sercarz Affidavit Confirms Constitutionally Deficient Performance

Rather than supporting counsel's performance, the Sercarz affidavit actually confirms the constitutional violations. The affidavit reveals that despite the 26-level enhancement being the central issue in the case—an enhancement that would determine whether Mr. Margolies faced a guidelines range in the low single digits or a sentence measured in decades—counsel retained no toxicologist, pathologist, or pharmacologist; conducted no pharmacokinetic analysis of heroin's duration of effect; made no independent medical investigation of alternative causation theories; performed no expert analysis of the eighteen-hour temporal gap; and failed to challenge the factual basis for the enhancement through expert testimony. (Sercarz Affidavit ¶¶ 11-22). This wholesale failure to investigate the factual predicate for the most significant sentencing enhancement falls demonstrably below constitutional standards, particularly in light of post-Burrage developments.

### a. Brady Requests Cannot Substitute for Independent Defense Investigation

The Government argues that Mr. Sercarz's Brady demands and the Government's negative response somehow satisfied constitutional requirements. (Dkt. 84 at 4). This argument fundamentally misunderstands defense counsel's investigative duties under Strickland and Rompilla. Brady material consists only of evidence that is both favorable to the defense and material to guilt or punishment. Much potentially exculpatory evidence, particularly expert analysis that has not yet been conducted, may not qualify as Brady material because it does not yet exist in the prosecution's files.

As the Supreme Court emphasized in Rompilla v. Beard, defense counsel cannot satisfy constitutional duties by simply accepting prosecutorial representations about evidence strength. 545 U.S. 374, 383 (2005). Similarly, in Kyles v. Whitley, the Court made clear that Brady obligations are limited to evidence in the government's possession and do not encompass the independent investigation that competent defense counsel must conduct. 514 U.S. 419, 437 (1995). Mr. Sercarz's Brady request, in which the Government represented that there were "no Brady materials indicating that the drugs allegedly delivered by the defendant on February 2, 2018, were not the cause of death; or that there was some intervening cause" (Sercarz Affidavit ¶ 14), cannot excuse his constitutional duty to conduct an independent investigation. The Government's investigation was necessarily focused on building its case, not exploring alternative causation theories or conducting the type of comparative

analysis that would reveal weaknesses in its own theory. Defense counsel must conduct an independent investigation, particularly where obvious weaknesses suggest such an investigation would be fruitful.

**b. No Reasonable Strategic Justification Existed for Limiting Investigation**

The Government cannot invoke the "strategic decision" doctrine to excuse counsel's investigative failures. Under Strickland, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690-91 (emphasis added). However, the Court was equally clear that strategic choices made "after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Here, no reasonable professional judgment supported limiting the investigation given the obvious vulnerabilities in the Government's causation theory. The eighteen-hour temporal gap alone would have prompted any competent attorney to question whether heroin consumed at 2:00 PM could cause death discovered the following morning. When combined with the mixed-drug evidence and the post-Burrage legal landscape demanding proof of "but for" causation, expert consultation was not merely advisable; it was constitutionally required.

Without expert consultation, Mr. Sercarz could not make an informed strategic decision about whether expert testimony would be beneficial. He lacked the basic medical knowledge necessary to evaluate the causation evidence. Mr. Sercarz could not have made an informed strategic decision about whether expert testimony would be beneficial without first consulting experts to understand the pharmacokinetic issues, the significance of the temporal gap, and the implications of the mixed-drug evidence. The failure to take even the preliminary step of expert consultation renders any claim of strategic decision-making hollow.

4. Mr. Margolies Was Clearly Prejudiced by Counsel's Failures

The Government cannot overcome the stark prejudice established by the 26-level enhancement differential. (Dkt. 84 at 4-6). Without the death-resulting enhancement, Mr. Margolies's base offense level would have been 12, resulting in a Guidelines range in the low single digits—likely measured in months rather than years. With the enhancement, his offense level increased to 38, resulting in a 168-month sentence—a term of imprisonment measured in years. This represents an exponential increase in sentence exposure based solely on an enhancement that counsel failed to investigate. Courts have found prejudice with much smaller sentence differentials where counsel failed to investigate viable defenses. The extraordinary enhancement here, combined with the obvious vulnerabilities in the causation evidence documented throughout this motion, establishes clear prejudice under Strickland.

**a. Plea Benefits Do Not Excuse Constitutionally Deficient Investigation**

The Government argues that Mr. Margolies received "substantial benefits" from the plea agreement by avoiding a potential mandatory minimum. (Dkt. 84 at 6). This argument misunderstands the constitutional standard for ineffective assistance in the plea context. Under Lafler v. Cooper and Missouri v. Frye, the question is not whether the defendant received some benefit from pleading guilty compared to the Government's threatened charges, but whether competent counsel armed with adequate investigation would have advised differently about whether to accept the plea or proceed to trial. Here, competent investigation of the causation weaknesses—the eighteen-hour temporal gap, the mixed-drug evidence, the "fent free" representation contradicted by fentanyl in the victim's system, the missing nine glassines, and the dramatic variations in product composition and packaging across controlled buys—could have revealed that the Government's evidence was far weaker than its confident assertions suggested. Such an investigation might have revealed that the Government's threat to file superseding charges carrying a mandatory minimum was hollow, as the causation evidence would not support a conviction at trial on such charges.

When the evidence weaknesses and sentence differential are properly considered, any reasonable defendant armed with accurate information would have chosen trial over accepting a plea that increased his exposure by 400-500% based on speculative causation evidence. This conclusion is reinforced by the Second Circuit's finding that Mr. Margolies stated "a plausible claim for relief"—language indicating appellate recognition that competent counsel properly investigating this case would have advised differently.

### b. The Second Circuit's Remand Language Confirms Merit

The Government's response cannot overcome the Second Circuit's analysis, which found Mr. Margolies had stated "a plausible claim for relief" and that the record "does not support denial of" his motion. This language strongly suggests appellate recognition of the claims' merit. The Court of Appeals specifically directed this Court to examine whether investigatory efforts "would have yielded meaningful exculpatory evidence" and to "evaluate anew whether Margolies could have succeeded in asserting an affirmative defense." These directives indicate appellate skepticism about the cursory treatment these critical issues received and confirm that the prejudice analysis must account for what proper investigation would have revealed.

## B. The Section 2252A(d) Affirmative Defense

### 1. The Government Effectively Concedes the District Court's Bases for Rejecting Mr. Margolies' Claim Were Wrong

The Government's argument regarding the § 2252A(d) affirmative defense confirms rather than excuses counsel's deficient performance. (Dkt. 84 at 2-3). The Government contends the defense "would not have succeeded," but this post-hoc rationalization cannot satisfy constitutional requirements. The standard is not whether the defense would "probably" have succeeded, but whether competent counsel would have investigated its viability before advising his client to plead guilty and thereby waive it forever. Courts consistently find prejudice where counsel fails to investigate complete defenses, even when factual challenges exist. See Florida v. Nixon, 543 U.S. 175, 190 (2004); Wiggins v. Smith, 539 U.S. 510, 526 (2003).

### a. Section 2252A(d) Provides a Complete Defense Requiring Heightened Investigation

Section 2252A(d) provides an affirmative defense if the defendant possessed less than three images of child pornography and promptly and in good faith, without retaining or allowing any person other than a law enforcement agency to access any image or copy thereof, took reasonable steps to destroy each such image or reported the matter to law enforcement and afforded such agency access to each such image. 18 U.S.C. § 2252A(d). This is not merely a mitigating factor or sentencing consideration—it is a complete defense that eliminates both criminal liability and the devastating collateral consequences that flow from child pornography convictions. Its potential availability triggers heightened investigative duties because the stakes include not merely the length of sentence, but the existence of criminal liability itself.

Mr. Sercarz's cursory consideration of this defense falls below constitutional standards given the complete elimination of criminal liability if successful; the serious collateral consequences of child pornography convictions including lifetime sex offender registration, severe employment restrictions, and housing limitations; the existence of factual disputes requiring investigation; and the necessity of understanding the modern internet context in which such material is received and transmitted.

### b. The Government Mischaracterizes the Evidence Through Conflation of Legal and Illegal Material

The Government's argument rests on a critical misrepresentation that pervaded the proceedings below. The Government repeatedly claims law enforcement seized "over 35,000 images of child erotica." (Dkt. 84 at 3; Sercarz Affidavit ¶ 18). This characterization is demonstrably false and reflects a fundamental confusion between legal and illegal material. The complaint and PSR state that Mr. Margolies's phone "contains approximately 35,000 images, among which are images that, based on my training and experience, I believe constitute 'child erotica.'" (Complaint ¶ 11(f)) (emphasis added). The phone contained 35,000 total images, a number that likely includes every photograph taken or received over months or years of phone usage, only some unspecified portion of which law enforcement characterized as child erotica.

More fundamentally, child erotica is not illegal. The Second Circuit has repeatedly emphasized that courts must carefully "distinguish[] between illegal child pornography and legal 'child erotica.'" United States v. Boles, 914 F.3d 95, 100 (2d Cir. 2019); United States v. Coreas, 419 F.3d 151, 152 (2d Cir. 2005). The distinction is not semantic—it reflects the constitutional imperative that criminal liability attach only to material meeting the legal definition of child pornography under 18 U.S.C. § 2256. The Government's conflation of legal child erotica with illegal child pornography demonstrates precisely why competent investigation was constitutionally required. Among the images specifically identified in the PSR were "a cartoon and several photographs of fully clothed children not in any way engaged in sexual activity." These lawful images—which may be disturbing to some viewers but are unquestionably protected by the First Amendment—have no bearing whatsoever on whether Mr. Margolies possessed "less than three images of child pornography" as required by § 2252A(d).

**c. Only One Item of Child Pornography Was Ever Identified**

The record establishes that Mr. Margolies was charged with possessing exactly one item of child pornography—the video received on October 25, 2018. Every relevant document confirms this singular focus. The sealed complaint identifies just one video constituting child pornography. At the bail hearing, the Government referenced "a particular video that constitutes child pornography." The Government's bail appeal described "one short video of approximately 30 seconds." The PSR noted "the offense involves a video that is 31 seconds in length." At sentencing, the Government acknowledged, "There was a video of CP." During plea allocution, Mr. Margolies acknowledged only "a video containing child pornography." Throughout these proceedings, the Government never identified any additional child pornography beyond this single video. Mr. Margolies "heavily disputed" even the Government's characterization of other images as child erotica (PSR ¶ 30), yet the Government now relies on this disputed characterization to argue that the investigation would have been futile. Where the defendant disputed the evidence characterization and the law enforcement characterization concerned legal material rather than child pornography, competent counsel was required to investigate independently rather than accept the Government's representations at face value.

d. The Undisputed Deletion of the Video Satisfies a Critical Statutory Element

The Government argues there is "no evidence" that Mr. Margolies "promptly" destroyed the video. (Dkt. 84 at 3). This assertion remarkably overlooks the fact that everyone involved in the case, including the Government itself, acknowledged that the video was deleted well before Mr. Margolies' arrest. The Government stated on the record: "you can tell from the library of images and the library of chats that it was deleted." The PSR noted: "He reportedly deleted the video" (PSR ¶ 94). Mr. Margolies testified during his plea allocution: "I subsequently deleted the video," testimony that neither the Government nor the Court challenged or questioned. Defense counsel's sentencing submission stated: "Wolfe deleted" the video, a representation the Government did not contest. The question was never whether the video was deleted—everyone agreed it was. The questions requiring investigation were whether this deletion was "prompt" and whether it was done "in good faith," both factual determinations that demanded expert consultation, timeline analysis, examination of how the video was

8

received, investigation of the sender's history and intent, and analysis of Mr. Margolies's response pattern to the material.

**e. Counsel Failed to Investigate Internet Shock Content Culture**

A critical deficiency in Mr. Sercarz's investigation was his failure to examine evidence regarding the prevalent culture of sending "shock content" to unsuspecting recipients. This failure fundamentally undermined any assessment of the viability of the Section 2252A(d) defense. Competent counsel representing a client in the digital age must understand the modern internet landscape. A well-documented culture exists, particularly among certain online communities, of transmitting shocking or disturbing images to unsuspecting individuals as crude humor or harassment. This phenomenon has been extensively documented and includes transmission of "shock porn" designed to disturb recipients, weaponization of disturbing content as online harassment, and misleading links or messages tricking recipients into viewing disturbing material they never intended to access.

This cultural context directly addresses both statutory elements necessary for the defense. For the good faith element, evidence that unwanted, shocking content is routinely transmitted to unsuspecting recipients supports an inference that a defendant who immediately deletes such material acted in good faith rather than with intent to possess prohibited content. The prevalence of this practice provides essential context for assessing whether a defendant's actions are those of someone who intentionally sought illegal material or someone who received unwanted material and promptly removed it. For the promptness element, understanding how shock content is transmitted offers the necessary context for determining what constitutes "prompt" deletion when someone receives unexpected, disturbing material. Expert testimony could establish typical response times and behavioral patterns when individuals receive unwanted shocking content, providing a baseline to measure Mr. Margolies's deletion timeline.

Competent counsel should have retained a digital forensics expert to analyze patterns of content reception, metadata showing when the material was received and when it was deleted, and typical response times to unwanted content across similar platforms. Counsel should have retained an internet culture expert to provide testimony regarding the prevalence of shock content transmission, the psychological and behavioral responses of recipients who receive such content unwillingly, and the characteristics distinguishing intentional possession from unwanted receipt. Counsel should have investigated how the material was received, including the specific platform used, the nature of any accompanying message, whether the sender had a history of transmitting shock content, and whether other recipients received similar material. Counsel should have examined Mr. Margolies's documented responses to the sender after receipt, the timeline of deletion relative to receipt measured in minutes or hours rather than days, whether the video was ever accessed after the initial receipt, and whether Mr. Margolies took any steps to prevent future transmissions from the sender.

Had counsel properly investigated these matters, expert testimony could have demonstrated that the receipt circumstances were consistent with unwanted transmission rather than intentional acquisition, directly addressing the "good faith" requirement. This evidence would have rebutted the Government's inference that possession necessarily equals intent and provided essential context explaining any delay between receipt and deletion within the framework of normal user behavior when confronted with unexpected disturbing content. The failure to investigate this dimension of the case constitutes deficient performance because the evidence was readily available through reasonable investigation; this evidence was essential to establishing a viable defense that would have eliminated criminal liability entirely; no reasonable strategic consideration justified omitting this investigation; and the stakes were exceptionally high—complete immunity from criminal liability and elimination of devastating collateral consequences including lifetime sex offender registration.

Counsel cannot make informed strategic decisions without first investigating the evidence necessary to establish a complete defense. See Strickland v. Washington, 466 U.S. 668, 690-91 (1984) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Mr. Sercarz's failure to investigate the factual foundation for the § 2252A(d) defense meant he could not competently advise Mr. Margolies about whether the defense was viable or whether accepting a plea agreement that foreclosed it forever was in his client's interest.

### 2. Mr. Margolies Was Prejudiced by Failure to Investigate the Affirmative Defense

Courts apply a different prejudice analysis where counsel fails to investigate complete defenses. The defendant need not show he would "probably" have prevailed at trial, only that the defense was sufficiently viable that knowledge of it would have affected his decision to plead guilty. See Lafler v. Cooper, 566 U.S. 156, 166 (2012); Missouri v. Frye, 566 U.S. 134, 148 (2012). The Government's arguments rest on speculation about what an investigation might have revealed, rather than what an investigation actually showed, precisely because no investigation occurred. The Government argues there was "no evidence" of prompt destruction, but this factual question required investigation, not assumption. The Government argues that additional child pornography "would likely" have been found if law enforcement continued searching, but this speculation cannot excuse counsel's failure to investigate a complete defense based on evidence that actually existed at the time of the plea.

Mr. Sercarz acknowledged in his affidavit that he "expected additional child pornography would be found" if law enforcement continued searching (Sercarz Affidavit ¶ 18), but this expectation was based on speculation rather than investigation. At the time Mr. Margolies entered his plea, law enforcement had identified only one video of child pornography. The § 2252A(d) defense requires possession of "less than three images"—meaning Mr. Margolies was well within the statutory threshold based on all identified evidence at the time. Whether additional material might have been discovered through further forensic analysis is irrelevant to whether counsel should have investigated the viability of asserting the defense before any such additional analysis occurred and before any superseding charges were filed. The fundamental constitutional violation is that these factual questions were never investigated, depriving Mr. Margolies of information necessary to make an informed plea decision.

**a. Awareness of a Defense Does Not Equal Investigation of Its Viability**

The Government contends Mr. Sercarz took reasonable investigative steps because he was aware of the defense and had case law and jury instructions in his files. (Dkt. 84 at 2; Sercarz Affidavit ¶ 27). This argument fails because awareness of a legal defense differs fundamentally from investigating its factual viability. While Mr. Sercarz may have been familiar with the statutory language and relevant case law, the record indicates that he took no concrete investigative steps to determine whether the defense could succeed given the specific facts of Mr. Margolies's case. Reading case law is not investigating. Possessing jury instructions is not investigating. Investigation requires examining the factual record, consulting experts, analyzing timelines, and developing evidence; none of which occurred in this case.

The Government claims that any failure to investigate would have been "objectively reasonable" because the defense "is highly unlikely" to apply. (Dkt. 84 at 2-3). This argument urges the Court to accept after-the-fact rationalizations about investigation futility—precisely what the Supreme Court has consistently rejected. See Wiggins, 539 U.S. at 526. The test is whether reasonable counsel would have investigated based on the information available when Mr. Margolies was deciding whether to plead guilty, not whether the Government can now suggest possible reasons why the defense might have failed if pursued. The Government cites Strickland's deference to counsel's judgments but omits the critical limitation that removes this case from that deference: Strickland only protects "strategic choices made after thorough investigation." Strickland, 466 U.S. at 690-91

(emphasis added). In this case, there was no investigation of the factual basis for the Section 2252A(d) defense. Without investigation, there can be no informed strategy that warrants deference.

**b. The Combined Failures Establish Clear Prejudice**

If Mr. Margolies had known that expert testimony about shock content culture could significantly strengthen the Section 2252A(d) defense; that only one video had been identified when the defense requires fewer than three images; and that the undisputed deletion of the video satisfied a key statutory element, a reasonable defendant would have seriously considered rejecting the plea agreement and proceeding to trial or at least asserting the defense before pleading. The failure to investigate both the death-resulting enhancement and the complete defense to Count Two left Mr. Margolies without understanding his viable defenses or any solid basis to make an informed plea decision. If proper investigation had shown a viable § 2252A(d) defense, Mr. Margolies might have avoided both the conviction on Count Two and the serious collateral consequences of child pornography convictions, including lifetime sex offender registration, severe employment restrictions that effectively foreclose entire categories of employment, and housing limitations that restrict where a convicted person can reside.

**POINT II: THE GOVERNMENT FAILS TO DEFEND THE DISTRICT COURT'S DECISION NOT TO HOLD A HEARING**

The Second Circuit's remand directed factual development that could only occur through an evidentiary hearing. The Sercarz affidavit obtained on remand confirms rather than refutes the need for such a hearing. Material factual disputes remain regarding what investigation would have revealed, what experts would have concluded, and how that information would have affected Mr. Margolies's plea decision. These disputes cannot be resolved on the papers and require testimony from experts in pharmacokinetics, toxicology, digital forensics, and internet culture, as well as examination of counsel's decision-making process. The Government's response acknowledges these factual disputes while arguing they should be resolved in its favor without hearing; precisely the type of resolution the Second Circuit's remand rejected.

**CONCLUSION**

The Government's response confirms rather than refutes the constitutional violations in this case. Mr. Margolies received constitutionally inadequate representation that deprived him of his right to make an informed decision about his case. Trial counsel's wholesale failure to investigate the factual predicate for the most significant sentencing enhancement violated the Sixth Amendment and resulted in a plea agreement that increased his sentence exposure by 400-500% based on speculative causation evidence that was never subjected to expert scrutiny.

The detailed controlled buy reports show that expert analysis would have identified critical weaknesses in the Government's causation theory. The significant variations in product composition—shifting between heroin-only and heroin-fentanyl mixtures—created obvious questions about which product type was involved in the victim's death. Differences in packaging and markings across transactions provided concrete evidence requiring comparison with the heroin found at the death scene. The nine missing glassines demanded investigation to determine whether they indicated consumption over time, acquisition from different sources, or replacement by another supplier altogether. The eighteen-hour temporal gap required pharmacokinetic analysis to establish whether heroin consumed in the early afternoon could be the "but for" cause of death discovered the next morning. The "fent free" representation contradicted by fentanyl in the victim's system offered strong evidence of alternative causation that was never investigated.

Similarly, counsel's failure to investigate the Section 2252A(d) affirmative defense deprived Mr. Margolies of the opportunity to present a complete defense that could have entirely eliminated criminal liability on Count Two. The undisputed deletion of the single video, combined with expert testimony about internet shock content culture and the absence of any other identified child pornography beyond that one video, formed a substantial defense that was abandoned without proper investigation.

The Second Circuit has already recognized the merit of these claims and directed further factual development. With the benefit of trial counsel's affidavit and the complete record, that development now clearly supports granting relief. The Sercarz affidavit confirms that no toxicologist was retained, no pharmacologist was consulted, no pharmacokinetic analysis was performed, and no expert comparative analysis of the controlled buy evidence was conducted, despite causation being the central issue determining whether Mr. Margolies faced a guidelines range measured in months, or a sentence measured in decades. This complete failure to investigate clearly falls below constitutional standards and caused unmistakable prejudice.

**WHEREFORE**, Mr. Margolies respectfully requests that this Court grant this Motion under 28 U.S.C. § 2255, vacate Mr. Margolies's conviction and sentence, allow Mr. Margolies to withdraw his guilty plea and proceed to trial, and grant such other relief as the Court deems just and proper.

Dated: September 29, 2025
New York, New York

Respectfully submitted,
/S/ *Alain V. Massena*
Alain V. Massena, Esq.
Massena Law, PC
305 Broadway, 7th Floor
New York, New York 10007
Tel: (212) 766-1700 Email:
avm@massenalaw.com